IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Pure Beauty Salons & Boutiques, Inc., *et al.*,[1] | Case No. 11-_____ (_____) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF BRIAN LUBORSKY IN SUPPORT OF
## CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, Brian Luborsky, do hereby declare, under penalty of perjury, that:

1.     I am the President, Chief Executive Officer and a director of each of Pure

Beauty Salons & Boutiques, Inc. ("OpCo") and BeautyFirst Franchise Corp. ("FranchiseCo,"

together, the "Debtors"). The Debtors are each corporations duly organized under, and existing

pursuant to, the laws of the State of Delaware. In my capacity as such, I have detailed

knowledge of, and experience with, the business and financial affairs of the Debtors.

2.     As the Debtors' Chief Executive Officer, I am one of the persons

responsible for devising and implementing the Debtors' business plans and strategies, overseeing

the Debtors' financial, operational and legal affairs and supervising the maintenance of their

books and records. In addition, in my capacity as an officer and director of the Debtors, I have

been involved in the Debtors' chapter 11 planning process (the "Chapter 11 Process"), including,

inter alia, (i) participating in the development, negotiation and implementation of various

strategic alternatives for restructuring, (ii) working with the advisors engaged by the Debtors in

connection with the Chapter 11 Process, (iii) supervising the preparation of documentation

needed to implement the Chapter 11 Process, and (iv) consulting on a regular basis with the other

---

[1]     The Debtors in these cases, along with the last four (4) digits of their federal tax identification numbers are: Pure Beauty Salons & Boutiques, Inc. (0520) and BeautyFirst Franchise Corp. (0477). The address for each Debtor is 3762 14th Avenue, #200, Markham L3R 0G7, Canada.

members of the Debtors' management team and the other members of the Debtors' Boards of Directors, with respect to the foregoing.

3.　　Today (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in an effort to preserve and maximize the value of their chapter 11 estates.

4.　　The Debtors intend to operate their business and to manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

5.　　I am advised by counsel that this Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**I.　　The Debtors' Business Operations**

6.　　The Debtors' operate stores that emphasize the sale of hair care and beauty products in a retail setting, and they also provide on-site hair care services at their retail stores. The Debtors' retail selection consists of highly recognized brands that vary with changing trends, and the Debtors offer one of the most comprehensive assortments of hair and beauty products in the industry. On the services side, the Debtors' salons offer a full range of custom styling, cutting, hair coloring, and many stores also offer other nail care and aesthetic services including facials, manicures, pedicures and waxing services.

7.　　The Debtors operate under the following trade names, which are licensed from Premier Salons Beauty Canada Inc. ("Trade Canada," a non-Debtor): Trade Secret, Beauty Express, BeautyFirst, PureBeauty, and Winston's Barber Shop. The Debtors' primary customer base includes the female head of the household shopping for her entire family, as well as singles

2

shopping for their own beauty products and accessories. The Debtors' stores are primarily mall based, however, approximately 10% are located in outdoor shopping centers.

8. Overall, OpCo owns and/or operates approximately 436 stores which are leased under various commercial real property leases.[2] In addition, FranchiseCo is a party to franchise agreements with approximately 13 franchisees that operate 22 BeautyFirst and 7 Trade Secret stores. Under the Debtors' franchise agreement, the Debtors provide their franchisees with, among other things, marketing programs and materials, product procurement and support, real estate assistance, logistics, and use of intellectual property in return for regular royalty payments.

## II. The Debtors' Formation and Capital Structure

9. The Debtors' corporate structure consists of a non-debtor holding company, Premier Salons Beauty Stores, Inc., a Delaware corporation ("HoldCo"), that owns 100% of the equity interest in OpCo and FranchiseCo. and HoldCo. is, in turn, 100% owned by non-debtor, Trade Canada, a Canadian entity which is owned by the Luborsky Family Trust II 2009 ("LFTII"). A copy of the Debtors' corporate organization chart is attached hereto as Exhibit 1.

10. The Debtors were formed in 2010 by LFTII for the purpose of acquiring approximately 465 retail stores (the "Purchased Stores") from Trade Secret, Inc. and its affiliated chapter 11 debtors (collectively, "TSI") through a sale conducted in this Court pursuant to section 363 of the Bankruptcy Code in TSI's then-pending chapter 11 bankruptcy case.[3] The

---

[2] The total number of stores owned by the Debtors includes several dozen unprofitable stores that the Debtors closed and/or vacated prior to the Petition Date due to operational cost and loss of revenue attendant to operating such stores.

[3] The TSI bankruptcy case, which was dismissed in January 2011, was jointly administered in this Court under case no. 10-12153 (KG).

3

consideration for the Purchased Stores was a credit bid by Regis Corporation ("Regis") of approximately $32.5 million, and the assumption by OpCo and FranchiseCo of certain liabilities against TSI aggregating approximately $13 million. Pursuant to that certain Asset Purchase Agreement dated as of October 11, 2010 (the "TSI Sale Agreement"), TSI sold to OpCo and FranchiseCo, as assignees of the rights of Regis under the TSI Sale Agreement, substantially all of TSI's assets related to the Purchased Stores. OpCo took title to substantially all of such assets except for the BeautyFirst Franchise Agreements which were assigned to FranchiseCo.

11.    In addition to the cash and non-cash consideration provided for under the TSI Sale Agreement, the court-order approving the sale of TSI's assets to the Debtors required LFT II to commit a maximum of $2 million of unsecured loans, equity capitalization or a combination of unsecured loans or equity capitalization to the extent the Debtors' liquidity required additional capital. Through transfers made by Trade Canada in December 2010 and June 2010, in the aggregate amount of $1.4 million and $600,000, respectively, LFT II arranged for and made available to the Debtors an additional $2 million to support its liquidity and operations.

12.    Also in connection with the TSI Sale Agreement and the transactions contemplated thereby (the "TSI Sale Transaction"), OpCo and FranchiseCo entered into (i) that certain Note dated as of October 11, 2010 in the approximate amount of $32.5 million payable to Regis (the "Regis Note"), and (ii) that certain Credit and Security Agreement dated as of October 11, 2010 by which OpCo and FranchiseCo granted Regis liens on substantially all of OpCo's and FranchiseCo's assets to secure payment of the Regis Note. The Regis Note provides that interest payments of eight percent (8%) of the outstanding balance are due each quarter, and principal must be paid down by $500,000 per quarter beginning on the last business day of December,

4

2011. The balance of the Regis Note comes due on September 30, 2015. Copies of the UCC-1 financing statements reflecting Regis's security interest in the assets of OpCo and FranchiseCo are attached hereto as Exhibit 2.

13.    The Debtors and Regis have been engaged in discussions regarding a possible restructuring of the Regis Note. Those discussions are ongoing and until completed, the Debtors understand that Regis will not require debt service payments during the Debtors' chapter 11 cases.

14.    As of the Petition Date, the Debtors have unsecured trade debt owing to their various product vendors and landlords of approximately $15 million. The Debtors currently employ approximately 2,330 people.

III.    **The Debtors' Operating Relationship with the Trade-Premier Group and Regis**

15.    In the TSI Sale Transaction, the Debtors did not acquire a fully-staffed back-office and related infrastructure capable of providing the Debtors with the full range of support services necessary to operate their retail stores across the United States. As a result, the Debtors opted to continue, with the consent of the other participants, the relationship that TSI shared with the members of the Trade-Premier Group (defined below) for the sharing, pooling and allocation of back-office support services.

16.    In addition to OpCo, the "Trade-Premier Group" consists of: (i) Premier Salons, Inc. ("Premier Salons US") and Premier Salons Ltd. ("Premier Salons Canada") and their U.S. and Canadian corporate affiliates, which own and operate 340 hair and cosmetic service salons throughout North America;[4] (ii) Trade Canada, which mainly provides management

---

[4]    The Luborsky Family Trust ("LFT") (a trust different from LFTII) is a significant shareholder of PS Hold Co., which is the indirect parent of Premier Salons US and Premier Salons Canada. LFT and LFT II are Alberta Canada trusts, whose beneficiaries are members of my family. In addition to my capacities for the Debtors, I am

services for all of the members of the Trade-Premier Group, but which also operates 10 stores in Canada; and (iii) Plantbest, Inc., which a horticultural manufacturing company that also shares space and costs with the Trade-Premier Group.

17.     OpCo is a party with the other members of the Trade-Premier Group to a Cost Sharing Agreement, dated as of November 1, 2010 (the "Cost Sharing Agreement"), which provides for the Trade-Premier Group to share the following services:  treasury and cash management, information technology, telephone, communications, head office facilities, store services and operations support, marketing, loyalty and gift programs, general accounting and support, purchasing, inventory management, insurance, payroll and human resources and billing (collectively, the "Shared Services").  Based on the over-head cost sharing and allocation in place when TSI was a member of the Trade-Premier Group (which took into account the respective revenues and costs of the members of the Trade-Premier Group), OpCo has agreed to pay (i)  $200,000 (USD) to Premier Salons US per month and (ii) $450,000 (CAD) to Trade Canada per month, on account of the Shared Services it receives from the Trade-Premier Group. Beginning in June, 2011, Premier US began paying Pure Beauty a $50,000 monthly fee on account of the Shared Services.  The Cost Sharing Agreement provides for a true-up to occur at the end of the fiscal year so that parties are compensated based on their actual costs incurred in providing the Shared Services, allocated according to their respective revenues.

18.     In addition to the Shared Services, the members of the Trade-Premier Group provide each other, either directly or by facilitating third party providers, with various goods and services.  Pure Beauty debits or credits (as applicable) the actual costs of these goods and services to intercompany accounts it maintains for the members of the Trade-Premier Group.

---

the President and CEO of the Premier Entities.  LFT and LFT II are separate and distinct entities as are the Debtors and the Premier Entities.  None of Premier Entities are a debtor or debtor-in-possession in these Chapter 11 Cases.

YCST01: 11481307.2                                                    070490.1001

Pure Beauty also debits and credits this account with the fees for Shared Services and payments, both related to goods and services and short-term advances. As a result, Pure Beauty is able to keep a running total of the aggregate amounts that it owes to, or is owed by, the other members of the Trade-Premier Group.

19.     Among the Shared Services administered by the Trade-Premier Group is a centralized system for product procurement and distribution for all of the Debtors stores. However, approximately 97% of the products sold by the Debtors are distributed from a warehouse owned and operated by Regis in Chattanooga, Tennessee (the "Regis Warehouse") pursuant to the terms of a Warehouse Services Agreement between the Debtors and Regis (the "Warehouse Agreement"). Pursuant to the Warehouse Agreement, Regis is responsible for managing the receipt of inventory purchased by the Debtors and shipped to the Regis Warehouse and delivering the Debtors' inventory from the Regis Warehouse to the Debtors' various retail locations and the stores operated by the Debtors' franchisees. The Debtors pay vendors directly for product shipped to the Regis Warehouse for the Debtors' account, but the Debtors and Regis share various costs incurred by Regis in operating the Regis Warehouse, which are allocated pursuant to a formula incorporating both the number of items received and distributed and total pounds shipped by each entity. The Debtors are current on all payments to Regis under the Warehouse Agreement. To the extent services under the Warehouse Agreement are for locations owned and operated by the Debtors' franchisees, these amounts (plus a small mark-up) are charged to the franchisees pursuant to the terms of the applicable franchise agreements.

## IV.     The Debtors' Financial Performance

20.     Many of the Purchased Stores have not performed as well as the Debtors' projected at the time they entered into the TSI Sale Transaction. At the time the TSI Sale Transaction closed, the Debtors projected EBITDA of approximately $6.7 million to the end of

7

July 2011, but actual results for the first nine (9) months post-closing have yielded an EBITDA loss of approximately $14.1 million.[5] This was primarily a result of revenues being $35.0 million less than projections through July 2011. This shortfall has led to a significant constraint on liquidity

21.     Second, in connection with the TSI Sale Transaction, TSI's and the Debtors' management and operations staff spent approximately six months negotiating with their landlords to obtain more favorable lease terms on a go-forward basis for certain of the Purchased Stores. For many of these stores the rent concessions were an absolute requirement for assumption as the existing lease terms for those stores were unsustainable under any scenario. In the aggregate, the Debtors were successful in obtaining concessions from their landlords, and a number of the Debtors' stores have been able to produce profitable results since the closing. However, a significant number of stores have failed to meet the revenue projections management relied upon when entering into the TSI Sale Transaction and remain unprofitable. These underperforming stores have resulted in a significant reduction in the Debtors' EBITDA and have necessitated a number of lease non-renewals and store closures and abandonments. The Debtors anticipate that these unprofitable locations will be shuttered during the Chapter 11 Cases (if not already), and along with other unprofitable locations, they will seek authority to reject a number of the leases underlying these locations in the opening days of the Chapter 11 Cases.

---

[5]     Originally, the Debtors' post-acquisition projected EBITDA was based on the prior 12 month run rate of the stores the Debtors acquired from TSI. To that projection, the Debtors calculated a 10% sales adjustment to account for products TSI was unable to offer its customers for a period of time due to inventory control issues suffered by TSI, but that the Debtors were, in fact, able to offer customers on a going forward basis. The Debtors' projections were not accurate due partially to loss of customers related to TSI's inability to stock certain customer-desired products on a regular basis. Despite the Debtors' efforts to stock items customers desired and had previously acquired from the Trade Secret Group, the Debtors believe that customer loyalty has been lost and the Debtors have been unable to entice former customers to return.

22.    Lastly, as a result in customer loyalty deterioration attendant largely to the operation of the Purchased Stores prior to the Debtors' acquisition of them, the Debtors have suffered significant sales declines which has further hampered liquidity. While the Debtors believe that an overall depression exists in the retail health and beauty segment, these issues have been particularly acute in light of the Debtors' recent acquisition of their businesses from TSI and the costs associated with closing the TSI Sale Transaction. The Debtors have attempted to refocus their attention on their core customers located at the most profitable locations in their operation but cannot sufficiently "right the ship" without the protection afforded by the Bankruptcy Code.

## V.    Events Leading to the Debtors' Chapter 11 Filing

23.    In light of the above-described developments, in late-summer 2011, the Debtors' management began discussions with Regis regarding various options to enhance the Debtors' liquidity and stave off a chapter 11 bankruptcy filing. Among other things, the Debtors performed an exhaustive store-by-store analysis to determine which stores represent the core profitability center for the Debtors' operations. Additionally, the Debtors' management commenced negotiations with Regis regarding the restructuring of the Regis Note, and such negotiations remain ongoing. The Debtors' ultimate equity holder, LFT II, also arranged for at least $2 million in additional working capital for the Debtors. Further, short-term funding was provided by Premier US by way of advances, all of which have been repaid. Despite these efforts, it became clear to the Debtors in September 2011 that a chapter 11 bankruptcy was likely unavoidable and that a court-supervised sale process provided the most likely avenue to save the Debtors as a going concern.

YCST01: 11481307.2                                                                                            070490.1001

24.     Therefore, in mid-September 2011, the Debtors expanded their boards of directors to include two additional, independent members.[6] On or about September 19, 2011, Hobart Truesdell and David Danziger were appointed to the Debtors' boards of directors to assist the Debtors in evaluating the Debtors' operational and liquidity issues, assess possible restructuring alternatives and evaluate the need and/or desirability of a sale of substantially all of the Debtors' assets through, among other possibilities, a transaction involving Regis and LFT II (and/or entities affiliated with Regis and LFT II).

25.     After considering other alternatives, the Debtors' Board of Directors, in their reasonable business judgment, concluded that the most effective way to maximize the value of their estates for the benefit of creditors is to complete a sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code, subject to higher or better bids at a public auction (the "Sale Transaction").  To this end, prior to the Petition Date, the Debtors, their management and professionals approached Regis – their secured lender – to determine Regis's interest in acting as a stalking horse bidder with respect to a sale of substantially all of the Debtors' assets.  It was the view of the Debtors' management that Regis was the most likely candidate to successfully act as the stalking horse bidder with respect to any sale of substantially all of the Debtors' assets given Regis's history with, and recent sale of, the Trade Secret Group to HoldCo, the business synergies currently in place by and among Regis and the Debtors, Regis's overall place in the competitive market in which the Debtors operate, and Regis's secured position with respect to substantially all, if not all, of the Debtors' assets.

26.     Regis confirmed its desire to act as the stalking horse bidder with respect to a sale of substantially all of the Debtors' assets and the parties have negotiated and agreed to

---

[6]     Until mid-September 2011, I was the Debtors' sole director.

the sale of substantially all of the Debtors' assets to a joint venture of Regis and a newly formed affiliate of LFT II (an insider of the Debtors and a trust with which I am affiliated) for a combined purchase price of approximately $32.5 million representing a credit bid from Regis, and the assumption of liabilities. Pursuant to an Asset Purchase Agreement among the Debtors and Regis (the "APA"), Regis's rights under the APA will be assigned to a newly formed affiliate of LFT II which intends to continue the Debtors' operations as a scaled down operation that eliminates unprofitable stores, and will continue to employ a substantial number of the Debtors' existing employees.[7]

27.     The Debtors believe that the transactions with Regis and LFT II contemplated under the APA – or a similar transaction to an alternative purchaser – will result in the emergence of a much stronger and economically viable retail enterprise that will maximize the value for the Debtors' businesses and ultimately benefit all creditor constituents. The Debtors believe that Regis's willingness to act as a joint venture partner in the stalking horse bid with respect to the sale of substantially all of the Debtors' assets is a significant step in preserving hundreds of retail stores on which their suppliers and landlords can continue to rely for ongoing business, and on which customers can rely for the superior services provided by the Debtors. Moreover, the Debtors believe that the consummation of the APA or a similar transaction to an alternative purchaser will be a driving force in stemming further significant reductions in their employee base. It is the Debtors' intention to use Regis's bid to set the platform for competitive bidding that will ultimately result in a value maximizing transaction to the benefit of all creditors.

---

[7] As of the Petition Date, the parties have agreed to a term sheet with respect to the APA and, in the coming days, will finalize and file the APA.

28.     To advance the foregoing goals, the Debtors – in consultation with their management and professionals – have retained the services of an experienced investment banker, SSG Capital Advisors, LLC, to assist the Debtors in conducting a robust post-petition marketing process to determine whether any bids higher and/or better than that contemplated by the APA are available in the marketplace.  Moreover, contemporaneous with their chapter 11 filing, the Debtors have filed a motion seeking approval of an auction process through which Regis will act as the stalking horse bidder and, assuming other bids are received, will conclude with an auction and sale hearing in January 2012.

## VI.    First Day Papers

29.     As a result of my first-hand experience, and through my review of various materials and information, discussions with other of the Debtors' executives, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in their "first-day" applications and motions listed on <u>Exhibit 3</u>. (collectively, the "<u>First Day Papers</u>"),  (b) the need for the Debtors to continue to operate effectively, (c) the deleterious effects upon the Debtors of not obtaining such relief, and (d) the immediate and irreparable harm to which the Debtors will be exposed immediately following the Petition Date unless the relief requested in the First Day Papers is granted without delay.

30.     I submit this Declaration in support of the Debtors' petitions and First Day Papers filed with the Court in connection with the commencement of these cases.

31.     I participated in preparing and have reviewed each of the First Day Papers (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct.  Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  If I were

12

called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Papers.

32.     The relief sought in the First Day Papers will minimize the adverse effects of the instant chapter 11 cases on the Debtors and result in maximum creditor recoveries. I believe that the relief sought in each of the First Day Papers is necessary to enable the Debtors to operate effectively in chapter 11 as debtors-in-possession.

33.     As described more fully in the First Day Papers, the relief requested therein was carefully tailored by the Debtors, in consultation with their advisors, to ensure that the Debtors' immediate operational needs are met and that the Debtors suffer no immediate and irreparable harm. I personally participated in the analysis that lead to the creation of each of the First Day Papers and assisted in the drafting and development of the relief requested therein. At all times, the Debtors' management and advisors remained cognizant of the limitations imposed on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' immediate operability.

34.     Accordingly, for the reasons stated herein and in each of the First Day Papers filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Papers be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed this 4th day of October, 2011.

_/s/ Brian Luborsky_____
Brian Luborsky

13

# Exhibit 1



Luborsky
Family Trust II
2009

(Alberta, CA)

Premier Salons Beauty
Canada Inc.

(Ontario, CA) 02-20-09

Premier Salons Beauty
Stores, Inc.

(Delaware, USA) 9-9-10

BeautyFirst Franchise Corp.

(Delaware, USA) 9-9-10

Pure Beauty Salons &
Boutiques, Inc.

(Delaware, USA) 9-9-10

# Exhibit 2

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Shawn Hollembeak      6123328511

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
RAVICH MEYER LAW FIRM

80 S. EIGHTH STREET

SUITE 4545

MINNEAPOLIS MN 55402
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:24 PM 10/06/2010
INITIAL FILING # 2010 3478660

SRV: 100972479

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PURE BEAUTY SALONS & BOUTIQUES, INC. | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3762 FOURTEENTH AVENUE SUITE 200 | MARKHAM, ON | | L3R0G7 | CA |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| REGIS CORPORATION | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7201 METRO BOULEVARD | MINNEAPOLIS | MN | 55439 | US |

4. This FINANCING STATEMENT covers the following collateral:

The following properties, assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: all personal and fixture property of every kind and nature including, without limitation, all goods (including, without limitation, all inventory, equipment, fixtures, and accessions), instruments (including, without limitation, promissory notes), documents, accounts (including, without limitation, health-care insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of credit rights (whether or not the letter of credit is evidenced by a writing), money, commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including, without limitation, all software and other intellectual property, all insurance policies, and all payment intangibles). Terms used in this description have meanings given to them in the Uniform Commercial Code, as adopted in the State of Minnesota (the ("UCC"); provided, however, that if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, such term has the meaning

| 6. | This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|---|
| 8. | OPTIONAL FILER REFERENCE DATA | | | | |

# UCC FINANCING STATEMENT ADDENDUM – COLLATERAL

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| 9a. ORGANIZATION'S NAME | | |
| PURE BEAUTY SALONS & BOUTIQUES, INC. | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

This FINANCING STATEMENT covers the following collateral specified in Article 9 of the UCC.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

Shawn Hollemeak       6123328511

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

RAVICH MEYER LAW FIRM

80 S. EIGHTH STREET

SUITE 4545

MINNEAPOLIS MN 55402

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:12 PM 10/06/2010
INITIAL FILING # 2010 3478306

SRV: 100972411

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME |
|---|
| BEAUTYFIRST FRANCHISE CORP. |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3762 FOURTEENTH AVENUE SUITE 200 | MARKHAM, CN | | L3R0G7 | CA |

| 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|
| CORPORATION | DE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME |
|---|
| |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
|---|
| REGIS CORPORATION |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7201 METRO BOULEVARD | MINNEAPOLIS | MN | 55439 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

The following properties, assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: all personal and fixture property of every kind and nature including, without limitation, all goods (including, without limitation, all inventory, equipment, fixtures, and accessions), instruments (including, without limitation, promissory notes), documents, accounts (including, without limitation, health-care insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of credit rights (whether or not the letter of credit is evidenced by a writing), money, commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including, without limitation, all software and other intellectual property, all insurance policies, and all payment intangibles). Terms used in this description have meanings given to them in the Uniform Commercial Code, as adopted in the State of Minnesota (the ("UCC"); provided, however, that if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, such term has the meaning

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum    [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

40175-7

# UCC FINANCING STATEMENT **ADDENDUM** – COLLATERAL

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| | 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|---|
| OR | 9a. ORGANIZATION'S NAME | | |
| | BEAUTYFIRST FRANCHISE CORP. | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
| | | | |

This **FINANCING STATEMENT** covers the following collateral
specified in Article 9 of the UCC.

# Exhibit 3

1. Motion for Order Authorizing Joint Administration Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1

2. Application of the Debtors for an Order Authorizing the Retention of Epiq Bankruptcy Solutions, LLC as Official Claims, Noticing and Balloting Agent as of the Petition Date

3. Debtors' Motion for Order (I) Approving Continued Use of Existing Cash Management System, (II) Authorizing Use of Existing Bank Accounts and Checks, (III) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis, (IV) Granting Administrative Expense Status to Postpetition Intercompany Claims and Fees for "Shared Services" Arising Postpetition

4. Motion for an Order (A) Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Wages, Compensation and Employee Benefits and Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business; and (B) Authorizing and Directing Applicable Banks and Other Financial Institutions to Process and Pay All Checks Presented for Payment and to Honor All Funds Transfer Requests Made By the Debtors Relating to the Foregoing

5. Motion for Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment

6. Motion for Order Pursuant to Sections 105(a), 363(b), 507(a)(8), and 541 of the Bankruptcy Code Authorizing (I) Payment of Certain Prepetition Taxes, and (II) Financial Institutions to Process and Cash Related Checks and Transfers

7. Motion of the Debtors for an Order Authorizing the Payment of Prepetition Claims of Common Carriers

8. Motion for an Order Authorizing Debtors to Honor Prepetition Customer Programs

9. Motion of the Debtors for an Order Authorizing the Debtors to (I) Pay Installments Under Prepetition Insurance Premium Finance Agreement, (II) Continue Prepetition Insurance Policies, and (III) Pay All Prepetition Obligations in Respect Thereof

12. Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; and (C) Granting Related Relief

13. Debtors' <u>Emergency</u> Motion Seeking Interim and Limited Approval of the Debtors' (I) Motion for an Order Authorizing the Debtors to Pay, Among Other Things, Certain Prepetition Wages, Compensation and Employee Benefits, and (II) Debtors' Motion for an Order Approving the Continued Use of Existing Cash Management System